AEI NET LEASE INCOME & GROWTH FUND, APPELLANT, *v.*
ERIE COUNTY BOARD OF REVISION ET AL., APPELLEES.

[Cite as *AEI Net Lease Income & Growth Fund v. Erie Cty.
Bd. of Revision*, 119 Ohio St.3d 563, 2008-Ohio-5203.]

(No. 2007–2101—Submitted October 1, 2008—Decided October 9, 2008.)

———

**Per Curiam.**

{¶ 1} AEI Net Lease Income & Growth Fund ("AEI") purchased the property at issue—a 1.3123–acre parcel improved with a 5,268–square–foot Applebee's restaurant—on May 12, 2004, for a price of $2,788,658. AEI appeals from a decision of the Board of Tax Appeals ("BTA"), in which the BTA affirmed the board of revision ("BOR") and adopted the sale price as the value of the property for tax year 2004. In its notice of appeal and merit brief, AEI advanced a number of arguments that have since been resolved against its position by this court. *Cummins Property Servs., L.L.C. v. Franklin Cty. Bd. of Revision*, 117

Ohio St.3d 516, 2008-Ohio-1473, 885 N.E.2d 222; *Rhodes v. Hamilton Cty. Bd. of Revision*, 117 Ohio St.3d 532, 2008-Ohio-1595, 885 N.E.2d 236.

{¶ 2} In its reply brief and at oral argument, AEI focused attention on the first assignment of error in its notice of appeal: the allegation that because "the lease encumbering the property does not meet the requirements established under Ohio law and appraisal standards as an arm's length, market lease," the "subsequent transfer based upon this lease cannot meet the requirements of an arm's length, market transaction." *Rhodes*, the previous case most directly on point, involved a big-box Walgreen's drugstore, and the background of the sale at issue there was a build-to-suit relationship between the former owner of the property and the drugstore-tenant. By contrast, the background of the sale at issue here involves a sale-leaseback transaction, whereby AEI's predecessor purchased the property and leased it back to the restaurant. AEI argues that this distinction is material to the determination of whether the sale to AEI should be regarded as an arm's-length transaction.

{¶ 3} We disagree and therefore affirm the BTA's decision on the authority of *Rhodes*.

I

{¶ 4} In 1995, the parcel at issue was improved with the Applebee's restaurant that currently operates at the location. Apple American Group operates the restaurant, which is leased by one of its subsidiaries. Previously, Apple American Group owned a large number of properties on which it operated Applebee's franchises in several states, including the property at issue. In 2003, Apple American Group bundled the subject property together with 25 other properties for purposes of selling them in what was characterized at the BTA hearing as a financing transaction.

{¶ 5} An entity called PRECO II CRIC, LLC ("Preco") purchased the 26 properties for an aggregate sale price of $65,408,297; Preco then leased back the properties to entities owned by Apple American Group so that the Group could continue to operate the restaurants. The sale price was determined by applying a capitalization rate to the income from the properties; the lease rates were determined on the basis of sales and creditworthiness of the tenant. Market rents were not consulted in setting the rent figure on the leases.

{¶ 6} The lease for the subject property has a term of 20 years and gives the lessee the option of four five-year renewals. The lease qualifies as a "triple net lease," pursuant to which the restaurant as lessee pays the utilities and also pays for all maintenance, taxes, and insurance. Annual base rent under the lease starts at $216,121 for each of the first five years and escalates for each subsequent five-year increment of the lease; if renewal options are exercised,

annual rent for the last five years will amount to $358,555.32. Expressed as annual rent per square foot, those figures amount to $38.40 per square foot during the first five years and $63.71 during the last five years. Appraisal testimony indicated that the square-foot rate exceeded market rent. The lease also provided that the restaurant as lessee would retain a right of first refusal if Preco sold the property. The sale-leaseback was consummated as of November 21, 2003.

{¶ 7} Subsequently, Preco sold the individual properties encumbered by the leases. The property at issue was sold to two related entities for $2,788,658: AEI Net Lease Income and Growth Fund XX Limited Partnership received assignment of a 45 percent interest as tenant-in-common with AEI Income & Growth Fund 24 L.L.C., which received a 55 percent interest. The date of sale was May 12, 2004.

{¶ 8} The county auditor set the value of the property at $896,040 for tax year 2004. The Board of Education for the Perkins Local School District ("BOE") filed a valuation complaint on March 30, 2005, requesting that the May 12, 2004 sale price be adopted as the value of the property as of January 1, 2004. The BOR held a hearing on June 14, 2005, and mailed its decision on July 5, 2005, adopting the May 2004 sale price as the value of the property.

{¶ 9} AEI then appealed to the BTA, which held a hearing on November 2, 2006. At the hearing, AEI offered the testimony of the vice president of real estate for Apple American Group concerning the sale-leaseback and the testimony and written report of an appraiser. The BTA issued its decision on October 12, 2007, holding that AEI had failed to sustain its burden to show that the May 2004 sale did not reflect the value of the property.

{¶ 10} AEI then appealed to this court.

## II

{¶ 11} AEI argues, in essence, that the amount of rent provided for in the long-term lease elevates the sale price of the fee interest in the property beyond the worth of the real property itself. In most respects, our decision in *Rhodes v. Hamilton Cty. Bd. of Revision*, 117 Ohio St.3d 532, 2008-Ohio-1595, 885 N.E.2d 236, leads us to reject AEI's position.

{¶ 12} In *Rhodes*, the developer who had constructed a build-to-suit Walgreen's drugstore and leased the property to the operator of the store sold the fee interest in the property to the current owner. *Rhodes v. Hamilton Cty. Bd. of Revision* (Mar. 9, 2007), BTA No. 2005–M–1098, at 3, affirmed, 117 Ohio St.3d 532, 2008-Ohio-1595, 885 N.E.2d 236. The auditor listed the sale price as the value of the property, and the new owner filed a complaint against that valuation. The auditor's fellow officials on the board of revision disagreed with the auditor

and voted to adopt a lower value. When the auditor appealed, the BTA reversed, holding that the sale price constituted the value of the property—a decision that we affirmed after the owner appealed to this court.

{¶ 13} Our decision in *Rhodes* was issued during the pendency of the present appeal and rejects several of the arguments that have been advanced in the briefs in this case as well. Specifically, the fact that the property is encumbered by a long-term lease does not by itself establish that the sale price must be adjusted to arrive at true value. In *Rhodes*, we relied on *Cummins Property Servs., L.L.C. v. Franklin Cty. Bd. of Revision*, 117 Ohio St.3d 516, 2008-Ohio-1473, 885 N.E.2d 222, in which we noted that the encumbrance of real property typically reflects an owner's attempt to realize its value. Id. at ¶ 27. To the extent that an existing long-term lease generates revenue above or below market, the existence of the lease will tend to increase or decrease the value of the fee interest in the property. *Rhodes* exemplifies this principle when the long-term lease is an above-market lease, while the exemplary case for a below-market long-term lease is *Berea City School Dist. Bd. of Edn. v. Cuyahoga Cty. Bd. of Revision*, 106 Ohio St.3d 269, 2005-Ohio-4979, 834 N.E.2d 782. See *Cummins*, ¶ 16, 27.

{¶ 14} But, as already noted, AEI points to a potentially significant distinction between this case and *Rhodes*. In this case, the long-term lease whose terms affected the price of the May 2004 sale constituted part of the November 2003 sale-leaseback; by contrast, the lease in *Rhodes* was entered into between the former owner and developer of the property and the drugstore-tenant. We now determine whether this point of distinction affects the validity of using the May 2004 sale price as the value of the property for tax year 2004.

### III

{¶ 15} As already discussed, *Rhodes* resembles the present case in that the current owner paid a higher sale price to acquire the property because the property was encumbered with a favorable lease that ensured a stream of rental income from a creditworthy tenant. AEI argues that the analysis in *Rhodes* does not control this case, because the above-market lease at issue in this case results from a sale-leaseback. As a result, the rent payable under the lease is artificially high, reflecting the need of AEI's predecessor to recover the sale price it paid through rent.

{¶ 16} More specifically, AEI contends that the sale-leaseback constituted a "financing transaction." For purposes of financing, Apple American Group demanded a sale price in an amount that met its need to realize cash on the deal, and Apple American also set the rent it would pay through the lease at a level high enough to permit its purchaser to benefit from paying the elevated sale price. Because the amount of rent under the lease reflects the payback for

"financing" advanced in the form of sale price, AEI argues that the subsequent sale price also exceeds the actual value of the realty.

{¶ 17} We discern two separate aspects of this argument and detect crucial flaws in each. Accordingly, we reject the contention that the existence of a long-term lease resulting from a sale-leaseback makes the subsequent sale price not indicative of true value.

## A

{¶ 18} The first aspect of AEI's argument lies in the contention that the lease resulting from the sale-leaseback must be viewed as a lease that is not at arm's length. AEI derives this argument from several cases, most prominently our recent decision in *Cummins Property Servs., L.L.C. v. Franklin Cty. Bd. of Revision*, 117 Ohio St.3d 516, 2008-Ohio-1473, 885 N.E.2d 222. AEI then argues that because the lease itself is not at arm's length, a subsequent sale of the fee interest subject to that lease cannot be viewed as determinative of value.

{¶ 19} In *Cummins*, we held as a general matter that the effect of encumbrances on the sale price of the fee interest did not make that sale price unreflective of the true value of the property. We predicated our holding in part on the observation that encumbering the property constituted an owner's method of realizing the value of the property. *Cummins*, ¶ 27. In that context, we hypothesized a situation in which a sale price might not be determinative of value if the contract creating the encumbrance was not entered into at arm's length, and we pointed to a sale-leaseback as having potential to present such a situation. *Cummins*, ¶ 30.

{¶ 20} But additional language in *Cummins* clarifies that the sale-leaseback situation in this case does not raise such concerns. In *Cummins*, we relied on the Wisconsin Supreme Court's decision in *Darcel, Inc. v. Manitowoc Bd. of Review* (1987), 137 Wis.2d 623, 405 N.W.2d 344, which stated that " '[s]ale-leaseback situations, for instance, may be undertaken with terms to avoid property tax and might not be entered at arms-length.' " *Cummins*, ¶ 30, quoting *Darcel*, at 631, 405 N.W.2d 344. Thus, the concern associated with sale-leaseback transactions lies in collusion between the parties to depress property value for tax purposes. No evidence in the present case suggests that such collusion existed—indeed, the transaction in this case actually increased the property value by providing for a stream of elevated rent payments.

{¶ 21} Moreover, the sale-leaseback in this case constitutes, in its totality, an arm's-length transaction. At oral argument, counsel for the taxpayer admitted that the parties to the sale-leaseback were unrelated. Each manifestly pursued its objective to obtain maximum value from the real property interests in the transaction. For its part, Apple American sought to realize the value of the fee

interest by selling the real property to obtain operating capital; on the other side of the deal, Preco sought to realize value from purchasing the fee interest by encumbering the property with a lease that provided a stream of rent income— income that would allow Preco to sell the property at a premium in the net-lease market. The fact that the rent rose in accordance with the amount of cash "financing" that Apple American desired does not mean that the sale-leaseback, taken as a whole, is anything but an arm's-length transaction.

{¶ 22} AEI lays great store by its assertion that under the sale-leaseback agreement, neither the sale nor the lease reflects an open-market transaction. It is true that in enumerating the elements that establish the arm's-length character of a transaction, we have stated that such a transaction " 'generally takes place in an open market.' " *Strongsville Bd. of Edn. v. Cuyahoga Cty. Bd. of Revision*, 112 Ohio St.3d 309, 2007-Ohio-6, 859 N.E.2d 540, ¶ 13, quoting *Walters v. Knox Cty. Bd. of Revision* (1989), 47 Ohio St.3d 23, 25, 546 N.E.2d 932; *Shiloh Automotive, Inc. v. Levin*, 117 Ohio St.3d 4, 2008-Ohio-68, 881 N.E.2d 227, ¶ 20. But it is equally true that once a sale price is presented that appears on its face to reflect a recent, arm's-length transaction, the opponent of using that sale price must shoulder the burden to show that the elements of a recent, arm's-length transaction were not present. *Cummins*, 117 Ohio St.3d 516, 2008-Ohio-1473, 885 N.E.2d 222, ¶ 41, citing *Cincinnati School Dist. Bd. of Edn. v. Hamilton Cty. Bd. of Revision* (1997), 78 Ohio St.3d 325, 327, 677 N.E.2d 1197. Additionally, it was AEI's burden of persuasion at the BTA because AEI challenged the determination of the BOR. *Columbus City School Dist. Bd. of Edn. v. Franklin Cty. Bd. of Revision* (2001), 90 Ohio St.3d 564, 566, 740 N.E.2d 276. In this case, the BTA found no reliable, probative evidence that impugned the arm's-length character of the November 2003 lease. *AEI Net Lease Income & Growth Fund v. Erie Cty. Bd. of Revision* (Oct. 12, 2007), BTA No. 2005–T–902, at 9.[1]

{¶ 23} The record supports the BTA's finding with respect to the issue of an open-market transaction. Although AEI's appraisal report stated that "[t]he lease rate and sale price were never negotiated on an open market," the appraiser's testimony at the BTA hearing shows that the statement reflects an assumption, not a proven fact. Moreover, the appraiser's assumption appears to relate to the fact that a sale-leaseback differs from other real estate transactions in the way it is marketed; apart from the allusion to that fact, no evidence was

---

1. The BTA stated that AEI's appraisal evidence was not "competent." Id. at 11. It is true that appraisal evidence may not be considered in valuing the property when there is a recent, arm's-length sale price; but some forms of appraisal evidence may in a proper case be competent on the issue of whether the transaction was arm's-length in character. We need not determine whether the BTA erred in this respect, because the BTA also regarded AEI's evidence to be unpersuasive. Because that alternative finding is supported by the record, we defer to it. *Strongsville*, 112 Ohio St.3d 309, 2007-Ohio-6, 859 N.E.2d 540, ¶ 23.

offered that the November 2003 transaction did not involve exposure to whatever market ordinarily exists for sale-leasebacks. Additionally, AEI offered the testimony of Apple American's vice president, but his testimony nowhere addresses whether the sale-leaseback itself involved exposure to the market for sale-leasebacks.

{¶ 24} Finally, AEI's citation of footnote 4 in *Cummins* is unavailing. In the footnote, we noted that "a sale-leaseback may not furnish an arm's-length sale price." 117 Ohio St.3d 516, 2008-Ohio-1473, 885 N.E.2d 222, ¶ 30. We simply did not address the separate question presented in this case: whether the sale price *in a subsequent sale* from the purchaser in the sale-leaseback determines the value of the property.

{¶ 25} At oral argument, AEI's counsel hypothesized a situation in which the parties to a sale-leaseback might artificially lower property value: a property would subsequently sell for less if, in a previous sale-leaseback, the parties had agreed to a low sale price and concomitantly low rent. But the below-market nature of such a sale-leaseback would inevitably raise serious questions about the arm's-length character of the sale-leaseback as a whole. Agreeing to a low sale price and low rent does not allow either party to that deal to realize the value of the realty, and as a result, the parties to such a transaction would likely not qualify as "typically motivated" for purposes of establishing the sale-leaseback as an arm's-length transaction. See *Cummins,* 117 Ohio St.3d 516, 2008-Ohio-1473, 885 N.E.2d 222, ¶ 31; *Rhodes v. Hamilton Cty. Bd. of Revision,* 117 Ohio St.3d 532, 2008-Ohio-1595, 885 N.E.2d 236, ¶ 10. Specifically, a purchaser in a sale-leaseback who encumbered the property at a plainly below-market rent would not be looking to realizing an optimal value for the realty. By stark contrast, the purchaser in a sale-leaseback like that at issue in this case is plainly maximizing value for the realty itself.

{¶ 26} For the foregoing reasons, we reject the contention that the lease in the present case does not qualify as an arm's-length lease in the relevant sense. We also hold that the effect that the existence of that lease had on the May 2004 sale price does not negate the arm's-length character of the May 2004 sale.

## B

{¶ 27} The second aspect of AEI's argument arises from the characterization of the sale-leaseback as a financing transaction. AEI is suggesting that the rent includes an increment that constitutes payback for the elevated sale price, i.e., a type of financing charge. According to AEI, that increment does not pertain to the value of the realty.

{¶ 28} We reject this contention, because AEI has not proved that the repayment for "financing" constitutes a value separable from that of the realty

under the circumstances of this case. Indeed, the lease specifically recites that "Landlord and Tenant intend for this Lease to be a true lease and not a transaction creating a financing arrangement." At the BTA hearing, Apple American's vice president explained the reason for the recital: "[W]ithin a financing arrangement, there is an obligation to repay a debt," but "[n]o debt is created as a result of this lease" because "[i]t is a lease and nothing more than a lease for the property."

{¶ 29} We addressed a similar issue in *St. Bernard Self–Storage, L.L.C. v. Hamilton Cty. Bd. of Revision*, 115 Ohio St.3d 365, 2007-Ohio-5249, 875 N.E.2d 85. In that case, a new owner entered into a real estate contract to purchase a self-storage facility, and the contract allocated approximately half the sale price to "goodwill." The owner argued that for purposes of determining the value of the realty, about one-half the sale price should be allocated to goodwill. We affirmed the BTA's decision to reject that contention. We held that the owner failed to prove the existence of goodwill as a business value that was separable from the value of the realty. As a result, the sale price that determined the value of the property included the amount allocated to goodwill.

{¶ 30} Likewise, AEI has not proved that any portion of the May 2004 sale price should be allocated as a type of finance charge separate from the value of the realty. To the contrary, the record shows nothing but the purchase of a fee interest in real property for a stated amount. The sale price pertains to real property that was sold in a recent, arm's-length transaction, and it therefore constitutes the measure of the value of the property.

## IV

{¶ 31} For all the foregoing reasons, we hold that the BTA correctly determined that the May 2004 sale price constituted the true value of the property at issue. We therefore affirm.

Decision affirmed.

MOYER, C.J., and LUNDBERG STRATTON, O'CONNOR, O'DONNELL, LANZINGER, and CUPP, JJ., concur.

PFEIFER, J., dissents.

---

Siegel, Siegel, Johnson & Jennings Co. L.P.A., Fred Siegel, Jay P. Siegel, and Nicholas M.J. Ray, for appellant.

James R. Gorry, for appellees Erie County Board of Revision and Erie County Auditor.

Britton, Smith, Peters & Kalail Co., L.P.A., Karrie M. Kalail, Susan R. Hartung, and Michael E. Stinn, for appellee Perkins Local School District Board of Education.