[Cite as *Hilliard City Schools Bd. of Edn. v. Franklin Cty. Bd. of Revision,* 139 Ohio St.3d 1, 2014-Ohio-853.]

HILLIARD CITY SCHOOLS BOARD OF EDUCATION, APPELLEE, *v.*

FRANKLIN COUNTY BOARD OF REVISION ET AL., APPELLEES;

U-STORE-IT, L.P., APPELLANT.

SOUTH-WESTERN CITY SCHOOLS BOARD OF EDUCATION, APPELLEE, *v.*

FRANKLIN COUNTY BOARD OF REVISION ET AL., APPELLEES;

U-STORE-IT, L.P., APPELLANT.

[Cite as *Hilliard City Schools Bd. of Edn. v. Franklin Cty. Bd. of Revision,*

139 Ohio St.3d 1, 2014-Ohio-853.]

*Taxation—Arm's-length sale—Sale price is presumed to establish value— Related-party disclosure negates arm's-length character of a sale only if it demonstrates that the buyer and seller are aligned in a way that makes their motivations atypical of the market.*

(Nos. 2012-1015 and 2012-1016—Submitted October 22, 2013—Decided

March 11, 2014.)

APPEALS from the Board of Tax Appeals, Nos. 2009-A-1069,

2009-A-1070, and 2009-A-1071.

_____

**Per Curiam.**

{¶ 1} In these appeals, the owner of several self-storage facilities in Franklin County contests the decision of the Board of Tax Appeals ("BTA"), which adopted the 2006 sale prices as the value of those properties for the 2006 tax year. All the properties at issue were acquired by U-Store-It, L.P., in a bulk purchase in 2006. U-Store-It raises the primary contention that the 2006 sale involved related parties and therefore could not qualify as an arm's-length transaction for purposes of valuing the properties. U-Store-It also contends that the sale prices cannot be used because they include consideration paid for personal property as well as real property.

**{¶ 2}** We hold that because the record contained affirmative evidence supporting the use of the stated sale prices as the value of the properties for tax-year 2006, and because U-Store-It failed to substantiate its claim that the sale prices should be allocated between real and personal property, the BTA did not act unreasonably or unlawfully in adopting the 2006 sale prices. We therefore affirm the decision of the BTA.

### Facts

**{¶ 3}** We confront two appeals from two BTA decisions. Case No. 2012-1015 addresses the 2006 tax-year value of one self-storage facility located in the Hilliard City School District; case No. 2012-1016 addresses the 2006 tax-year value of two such facilities located in the South-Western City School District.[1] All three self-storage facilities were acquired by U-Store-It in the same transaction, and the issue of their value turns on the resolution of the same legal and factual questions. The appeals were consolidated for argument before the master commissioner, and we now dispose of them with a single decision.

### A. The properties at issue were all sold to Jernigan Property Group in 2005, then sold by Jernigan to U-Store-It in 2006

**{¶ 4}** Twice in a little over a year, the properties at issue were transferred. The first sale occurred in April 2005, in which Jernigan Property Group purchased several facilities; the second sale occurred in August 2006, in which Jernigan Property Group sold nine properties to U-Store-It for more than $44 million. Both times, the sale contracts separately set forth the consideration for each property, and the 2006 sale prices as allocated by the contract were reported as the sale price on the conveyance-fee statements.

---

1. The BTA specifically found that the 2006 value should be carried forward to tax-years 2007 and 2008 as to all of the properties at issue. U-Store-It does not separately challenge the carry-forward apart from contesting the use of the sale prices for the 2006 tax year. Accordingly, our affirmance of the BTA's disposition for tax-year 2006 extends to 2007 and 2008 as well.

{¶ 5} The Hilliard City Schools Board of Education and the South-Western City Schools Board of Education ("school boards" or "school board") filed complaints in relation to the properties located in their respective districts. Another self-storage facility that was part of the 2006 sale is located in the Reynoldsburg City School District, and the BTA's decision in that case was also appealed to this court. That case has settled, however. 134 Ohio St.3d 1477, 2013-Ohio-770, 984 N.E.2d 22. Nevertheless, the record of that case was incorporated into the records of the cases before us, and we will consult the evidence in that record in reviewing the BTA's decisions.

{¶ 6} The school boards' complaints asked that the 2006 sale prices be applied to the individual properties for the 2006 tax year. The Franklin County Board of Revision ("BOR") determined that the 2006 sale did not qualify as an arm's-length transaction and therefore adopted the 2005 sale prices for tax-year 2006 instead. The BTA reversed and adopted the 2006 sale prices as the 2006 property values.

{¶ 7} Below is a chart showing the values assigned to the properties at issue here for tax-year 2006, in these proceedings:

| Supreme Court Case No. | Address | School District | Auditor | BOR value (2005 sale price) | BTA value (2006 sale price) |
|---|---|---|---|---|---|
| 2012-1015 | 5252 Nike Road | Hilliard | 3,500,000 | 4,298,500 | 4,700,000[2] |
| | | | | | |
| 2012-1016 | 5411 W. Broad | South-Western | 2,760,00 | 2,715,000 | 4,350,000 |
| | | | | | |
| 2012-1016 | 3300 Southwest Blvd. | South-Western | 3,500,000 | 4,483,500 | 6,200,000 |

2. With respect to the BTA's 2006 value for the Nike Road property, the contract quoted $4.8 million as the sale price, but the conveyance-fee statement quoted $4.7 million as the sale price. The BTA adopted the latter as the value of the property.

## B. What the evidence shows

*1. Evidence pertaining to the arm's-length character of the 2006 sale*

**{¶ 8}** At the November 26, 2007 BOR hearings, U-Store-It's counsel introduced both testimony and documents. The documents included the purchase agreements for the 2005 sale to Jernigan Property Group and the 2006 sale by Jernigan Property Group to U-Store-It, along with closing statements and a copy of a Form 10-Q filed by U-Store-It.

**{¶ 9}** The Form 10-Q, a filing with the Securities and Exchange Commission ("SEC") required of U-Store-It Trust as a publicly traded entity listed on the New York Stock Exchange, disclosed that the 2006 sale was in a certain respect a "related-party" transaction. The disclosure points out that the sale contract was entered into between Jernigan Property Group as seller and U-Store-It as buyer on April 3, 2006. Dean Jernigan, who was president of Jernigan Property Group and held "a 20% beneficial interest in one self-storage facility partially owned by Jernigan Property Group and related companies and partnerships," was appointed president and chief executive officer ("CEO") of U-Store-It Trust on April 24, 2006. The transaction "was subject to review and final approval by a majority of the independent members of the Company's Board of Trustees." The 10-Q further noted that "Mr. Jernigan has discontinued all involvement in the day-to-day management or operation of the Jernigan Property Group."

**{¶ 10}** U-Store-It relies on the Form 10-Q as establishing that the 2006 sale was not at arm's length, because it was a related-party transaction for SEC reporting purposes.

**{¶ 11}** Kathleen Weigand, executive vice-president, general counsel, and secretary of U-Store-It Trust, testified. She reiterated the points made in the 10-Q and emphasized the importance of a noncompete clause in the 2006 sale agreement, to which Jernigan personally was made a party.

**{¶ 12}** In her testimony, Weigand fleshed out the disclosure of the related-party transaction. Weigand added that Jernigan "had an interest" in the Jernigan Property Group, L.L.C. But notable by its absence is any testimony—or any statement in the Form 10-Q itself—that (1) Jernigan had previously owned or acquired an interest in U-Store-It Trust or that (2) Jernigan Property Group and U-Store-It were in any other respect under common ownership.

*2. Evidence relating to the value of the properties*

**{¶ 13}** Weigand also testified that in conjunction with the 2006 purchase, U-Store-It did not commission outside appraisals, but did perform underwriting in-house, "placing a value on the properties based on net operating income," including developing a cap rate and taking into account vacancy loss and cash flow from rents. This in-house underwriting was the basis for the per-property allocated purchase price for each parcel set forth in the 2006 sale.

**{¶ 14}** Weigand's testimony describes, in essence, an income approach, performed by U-Store-It itself, from which the sale prices for the individual properties were developed. That process also helped persuade the independent trustees of U-Store-It Trust that the deal was fair in the context of Dean Jernigan profiting from the trust's purchase while contemporaneously being hired as the trust's new CEO.

**{¶ 15}** U-Store-It has also advanced an argument that the sale prices of the facilities at issue include personal property as well as realty. The 2006 sale refers to tangible personal property to be conveyed along with the realty. Attached to the 2006 sale contract is a bill of sale for the personal property, with an extensive list of personalty appended. But the bill of sale contains no indication of the cost or value of any individual items of personal property, nor does the sale contract elsewhere set forth an allocation to personalty. The same can be said of the other separately identified item of personal property: the intangible covenant not to compete.

## C. Determinations by the BOR and the BTA

{¶ 16} On May 4, 2009, in the Reynoldsburg case, the BOR eliminated the 2006 sale as an arm's-length transaction. Accordingly, the BOR ordered that the 2005 sale prices be adopted as the value of the properties for tax-years 2005 and 2006.

{¶ 17} In the present cases, which involve the properties in the Hilliard and South-Western school districts, the record contains no deliberation of the BOR, but the determinations issued likewise adopted the 2005 sale prices for tax-year 2006.

{¶ 18} The school boards appealed to the BTA, advocating adoption of the 2006 sale prices. The BTA issued its decisions in these cases on May 15, 2012. The decision in the South-Western City Schools' case was the lead decision, and the decision in the Hilliard City Schools' case adopted the reasoning of the lead decision.

{¶ 19} The BTA presumed the validity of the 2006 sale price for the value of the properties for tax-year 2006. *South-Western City Schools Bd. of Edn. v. Franklin Cty. Bd. of Revision*, BTA Nos. 2009-A-1070 and 2009-A-1071, 2012 WL 1869990, *3 (May 15, 2012). The BTA summarized U-Store-It's objections as follows: "[T]he sale in question does not qualify as an arm's-length transaction because it was a bulk sale with allocated prices among many properties between related parties and the sale included items other than real property." *Id*.

{¶ 20} With respect to the bulk-sale allocation issues, the BTA relied on *FirstCal Indus. 2 Acquisitions, L.L.C. v. Franklin Cty. Bd. of Revision*, 125 Ohio St.3d 485, 2010-Ohio-1921, 929 N.E.2d 426, to conclude that U-Store-It bore the burden to show that the sale prices reported on the conveyance-fee statements did not reflect true value. *South-Western City Schools Bd. of Edn.,* 2012 WL 1869990, at *3-4. According to the BTA, "[t]he property owner has provided no evidence or testimony with regard to the subject sale to demonstrate why the sale

prices, as allocated to each property and set forth on the subject conveyance fee statements, are not reflective of the subjects' true values." *Id.*, *4. With respect to the nonrealty items in the sale, the BTA found that nothing in the record indicated that "the allocated bulk sale price was not indicative of market value" and concluded that "the price paid by the property owner for the subject properties represents the true value of the properties for tax year 2006." *Id.*, *6.

{¶ 21} With respect to the related-party issue, the BTA found that Jernigan's "relationship to the seller was limited in scope, constituting a minimal interest in one of the nine storage facilities purchased." *Id.*, *5. Also significant were the facts that "the sales contract in question was entered into on April 3, 2006, prior to Mr. Jernigan beginning his tenure with the buyer on April 24, 2006" and that "the sale transaction was reviewed and approved by a majority of the independent members of the buyer's board of trustees." *Id.* Given these circumstances, the BTA found that Jernigan's role did not "compromise[ ] the arm's-length nature of the sale transaction under consideration." *Id.* Additionally, the BTA noted that there was no dispute that the 2006 sale was closer to the lien date than the 2005 sale.

{¶ 22} Accordingly, the BTA reversed the BOR's decision and adopted the 2006 sale prices as the value of the properties for tax-years 2006, 2007, and 2008.

### Analysis

#### A. The BTA's explicit findings may be reviewed on appeal

{¶ 23} The school boards argue that U-Store-It has waived all of the arguments it advances in these appeals, because U-Store-It's brief at the BTA consisted of a single paragraph that did not advance specific arguments. Despite the brevity of U-Store-It's submission at the BTA, the BTA considered the issues raised before the BOR: whether the aggregate sale price was properly allocated among the real estate parcels; whether the sale, as a "related-party transaction,"

qualified as an arm's-length transaction under R.C. 5713.03; and whether the sale price would have to be allocated among real-estate and nonrealty assets in the sale. On appeal, U-Store-It's briefs challenge the BTA decisions on these points.

{¶ 24} We conclude that the doctrine of waiver is inapplicable. Because the BTA explicitly addressed and resolved the issues raised in U-Store-It's propositions of law, those propositions are properly before this court.

{¶ 25} The case the school board relies on, *The Chapel v. Testa*, 129 Ohio St.3d 21, 2011-Ohio-545, 950 N.E.2d 142, differs in precisely this respect from the present case. In that case, the BTA made no mention of the timing issue raised by the tax commissioner on appeal to this court. That the BTA failed to address the issue was not surprising: the commissioner had not raised the issue below.

{¶ 26} By stark contrast, these appeals contest actual findings of the BTA. We have jurisdiction under R.C. 5717.04 to review the BTA decisions in light of the "errors complained of" in the BTA decision, and we will proceed to exercise that jurisdiction under these circumstances.

## B. The record supports rather than rebuts the adoption
## of the stated prices as property values

{¶ 27} The BTA relied on case law to place the burden on U-Store-It to show that the amounts reported on the conveyance-fee statements as consideration for the realty did not equate to the value of the property. Both with respect to the arm's-length-transaction issue and the allocation issues, that was correct.

{¶ 28} Typically, a board of education makes a prima facie showing of value by presenting the conveyance-fee statement showing the sale and the price. *See Worthington City Schools Bd. of Edn. v. Franklin Cty. Bd. of Revision*, 124 Ohio St.3d 27, 2009-Ohio-5932, 918 N.E.2d 972, ¶ 28-29 (when a school board has presented a deed and a conveyance-fee statement, rebuttal of the sale price " 'lies in challenging whether the elements of recency and arm's-length character

between a willing seller and a willing buyer are genuinely present for that particular sale' ”), quoting *Cummins Property Servs., L.L.C. v. Franklin Cty. Bd. of Revision*, 117 Ohio St.3d 516, 2008-Ohio-1473, 885 N.E.2d 222, ¶ 13. Moreover, this court has held that when a sale price has been reported on the conveyance-fee statement, the party opposing the use of that price typically bears the burden of showing that the reported price is not the proper value. *FirstCal*, 125 Ohio St.3d 485, 2010-Ohio-1921, 929 N.E.2d 426, ¶ 25.

{¶ 29} U-Store-It maintains that it succeeded in rebutting the 2006 sale prices by showing that (1) the 2006 sale was a related-party transaction, thereby failing to qualify as an arm's-length transaction, and (2) the sale included personal property as well as real property, without allocating a value between the different kinds of property. We now examine these contentions in detail.

*1. The related-party disclosure in Form 10-Q did not rebut*

*the propriety of using the sale prices as property values*

{¶ 30} U-Store-It claims that the 2006 sale prices cannot be used to value the properties because that year's sale was not at arm's length.[3] To determine the validity of this contention, it is essential to explain why a relationship of the parties may prevent a sale from indicating the market value of the property.

{¶ 31} Both the appraisal literature and the case law define "market value" in part in terms of whether the buyer and the seller act as "typically motivated market participants" who are acting "in their own self-interest." *See, e.g.*, Internatl. Assn. of Assessing Officers, *Property Assessment Valuation* 17-19 (2d Ed.1996) (quoting the Uniform Standards of Professional Appraisal Practice definition that calls for a buyer and a seller to be "typically motivated" and to be

---

3. In U-Store-It's view, the related-party disclosure is dispositive and establishes that the 2006 sale prices cannot establish the property values. A weak form of this argument might contend merely that a burden should be placed on the school board to show that the sale prices ought to be used. But because the record furnishes an affirmative basis for adopting the sale prices as the property

"acting in what they consider their best interests," *id*. at 18); American Institute of Real Estate Appraisers (now the Appraisal Institute), *The Dictionary of Real Estate Appraisal* 194-195 (1984) (definition of "market value" calling for the buyer and seller to be "motivated by self-interest"); Appraisal Institute, *The Appraisal of Real Estate* 22-25 (13th Ed.2008) (quoting various definitions of market value to the same effect); *N. Royalton City School Dist. Bd. of Edn. v. Cuyahoga Cty. Bd. of Revision*, 129 Ohio St.3d 172, 2011-Ohio-3092, 950 N.E.2d 955, ¶ 33 ("one primary characteristic of an arm's-length sale is that the parties act in their own self-interest"); *AEI Net Lease Income & Growth Fund v. Erie Cty. Bd. of Revision*, 119 Ohio St.3d 563, 2008-Ohio-5203, 895 N.E.2d 830, ¶ 25 (a "typically motivated" transaction is one in which the buyer and seller are pursuing their own financial interests), citing *Cummins Property Servs., L.L.C. v. Franklin Cty. Bd. of Revision*, 117 Ohio St.3d 516, 2008-Ohio-1473, 885 N.E.2d 222, ¶ 31, and *Rhodes v. Hamilton Cty. Bd. of Revision*, 117 Ohio St.3d 532, 2008-Ohio-1595, 885 N.E.2d 236, ¶ 10. It follows that the inquiry into whether "the parties to a sale are related bears on whether they are self-interested for purposes of R.C. 5713.03." *N. Royalton*, ¶ 33.

{¶ 32} In *N. Royalton*, we further explained that the related-party inquiry is important "because related parties may be pursuing the identical interest of common owners rather than acting as separately interested, typically motivated actors in the marketplace." *Id*.

{¶ 33} The classic related-party situation arises when the interests of the seller and the buyer are aligned (atypically for the market) by their being under common ownership. For example, in *Shiloh Automotive, Inc. v. Levin*, 117 Ohio St.3d 4, 2008-Ohio-68, 881 N.E.2d 227, a sale was arranged between MTD Products, Inc., as the seller and Shiloh Industries, Inc., as the purchaser. MTD

---

values, we need not decide and do not reach the question whether U-Store-It's referring to the Form 10-Q placed a burden of going forward on the school board.

owned a 37 percent interest in Shiloh at the outset; during the negotiation of the contract, MTD increased its ownership in Shiloh to majority status: the seller thus owned 51 percent of the buyer. *Id*. at ¶ 8-9. We affirmed the BTA's conclusion that the sale could not be regarded as an arm's-length transaction that furnished the value of the personal-property assets, because of the "collective, mutual interests" of the parties. *Id.* at ¶ 30.

{¶ 34} We have acknowledged that another type of relationship between the parties may defeat the arm's-length character of the sale. If the sale of property constitutes one element of a larger contractual relationship, the existence of those other contractual provisions may create motivations for the seller and the buyer that are atypical of the market as a whole. *See Cummins*, 117 Ohio St.3d 516, 2008-Ohio-1473, 885 N.E.2d 222, ¶ 30, fn. 4; *S. Euclid/Lyndhurst Bd. of Edn. v. Cuyahoga Cty. Bd. of Revision*, 74 Ohio St.3d 314, 317, 658 N.E.2d 750 (1996) (in a sale-leaseback situation, "a willing buyer would pay less for property if the leaseback arrangement limited the amount of rent the buyer could collect").

{¶ 35} Because it does not establish an alignment of interest or other motivations atypical of the market, U-Store-It's statement in the Form 10-Q that the parties are related fails to rebut the presumptive arm's-length character of the 2006 sale.

{¶ 36} The disclosure in the Form 10-Q does not intimate any common ownership of Jernigan Property Group and U-Store-It. To be sure, the disclosure does state that Jernigan personally had an ownership interest in one of the properties transferred, but there is no indication that Jernigan owned a share of U-Store-It as of the time of sale, or that the seller and buyer were otherwise under common ownership.

{¶ 37} Moreover, the Form 10-Q disclosure shows that in spite of Jernigan being hired by U-Store-It in conjunction with the sale, he did not exercise control over the sale itself. First, the contract was signed on April 3, before Jernigan

assumed his position with the buyer on April 24. Second, the sale was approved by the independent trustees of U-Store-It. Thus, even as the Form 10-Q disclosure raises concerns about common ownership, it dispels them.

{¶ 38} U-Store-It refers to Financial Accounting Standards ("FAS") No. 57, Related Party Disclosures, created by the Financial Accounting Foundation, as well as to a publication of the American Institute of Certified Public Accountants that discusses FAS No. 57 to support its argument. U-Store-It argues that the very fact that a related-party disclosure is required under accounting principles means that the sale cannot be regarded as presumptively arm's length for tax valuation purposes. But a review of the accounting standard shows that that conclusion is not justified. The accounting standard states that "[t]ransactions involving related parties *cannot be presumed* to be carried out on an arm's-length basis," because "free-market dealings *may* not exist." (Emphasis added.) But the standard also acknowledges that particular circumstances may be shown that substantiate the arm's-length character of the transaction. Accordingly, FAS No. 57 does not, contrary to U-Store-It's assertions, establish that a related-party transaction is necessarily one that is not at arm's length.

{¶ 39} The accounting standards call for disclosure in order to put investors on notice of circumstances material to evaluating the sale and to permit further inquiry into those circumstances. But it is not the requirement of disclosure that disqualifies a sale as arm's length; rather, it is the content of that disclosure. A related-party disclosure negates the arm's-length character of the sale if and only if it demonstrates that the interests of the seller and the buyer are aligned in a way that makes their motivations atypical of the market in general. Because in this case the Form 10-Q disclosure did not unequivocally establish an alignment of interests between Jernigan Property Group and U-Store-It, and because Weigand's testimony furnished an affirmative basis for relying on the

allocated sale prices, the BTA could reasonably and lawfully decide to adopt the 2006 prices as the property values.

*2. U-Store-It failed to demonstrate that the sale prices were misallocated or that they included amounts attributable to the purchase of personal property*

{¶ 40} U-Store-It's second proposition of law states that the BTA decision is unreasonable and unlawful because the board made "no inquiry as to [the] basis for the allocation of the purchase price." We disagree.

{¶ 41} The BTA adopted sale prices that were fully allocated under the sale contract and reported as the consideration for the realty on the conveyance-fee statements. Under *FirstCal*, 125 Ohio St.3d 485, 2010-Ohio-1921, 929 N.E.2d 426, ¶ 22-25, the burden lay squarely on U-Store-It to prove an allocation that would reduce the value of the property. *See also Bedford Bd. of Edn. v. Cuyahoga Cty. Bd. of Revision*, 132 Ohio St.3d 371, 2012-Ohio-2844, 972 N.E.2d 559, ¶ 22. U-Store-It did not discharge that burden.

{¶ 42} As for reallocation of the total sale price among the parcels, Weigand's testimony strongly contravened the theory that the reported sale prices were misallocated. As for an allocation of part of the total sale price to personal property, U-Store-It's burden was to present "corroborating indicia" in support of such an allocation. *Sapina v. Cuyahoga Cty. Bd. of Revision*, 136 Ohio St.3d 188, 2013-Ohio-3028, 992 N.E.2d 1117, ¶ 18. If the in-house underwriting at U-Store-It took the value of personal property into account, that fact should have become clear through U-Store-It's evidence. But the testimony offered by U-Store-It did not indicate that the sale prices separately took personal-property value into account.

{¶ 43} U-Store-It relies on the bare fact that a considerable amount of tangible personal property, plus the intangible asset of the noncompete clause, transferred along with the real estate. But it was not unreasonable on this record for the BTA to conclude that in the context of an aggregate $44 million purchase

of self-storage facilities, the parties did not contemplate attaching any separate value to the personal property.

{¶ **44**} U-Store-It cites *Consol. Aluminum Corp. v. Monroe Cty. Bd. of Revision*, 66 Ohio St.2d 410, 423 N.E.2d 75 (1981), for the proposition that the BTA had a duty to inquire into the allocation of the sale prices. That citation is unavailing, because the evidence in the present case, unlike the record in *Consol. Aluminum,* affirmatively shows the propriety of allocating the entire sale price to the realty.

{¶ **45**} Moreover, *Consol. Aluminum* involved a purchase of an entire aluminum division, consisting of realty and personalty used in a manufacturing business. By contrast, self-storage is a real-estate business: it involves leasing the use of real property, much as apartment buildings and hotels do. It follows that the income approach performed by U-Store-It's in-house underwriting likely arrived at a figure reflecting an overwhelming predominance of real-property value. *See St. Bernard Self-Storage,* 115 Ohio St.3d 365, 2007-Ohio-5249, 875 N.E.2d 85, ¶ 24 ("The income generated by that [self-storage] business derives from St. Bernard's granting the right to use space, either outdoors or within the buildings," and therefore "[a]s a matter of pure logic, rent revenue relates to such rights and privileges [appertaining to the land and improvements]"), and *Dublin Senior Community Ltd. Partnership v. Franklin Cty. Bd. of Revision*, 80 Ohio St.3d 455, 460, 687 N.E.2d 426 (1997) (in a senior living facility, rent for an apartment could properly be taken into account when valuing realty, as opposed to charges for food service and housekeeping, which constituted nonrealty business revenue); *compare LTC Properties, Inc. v. Licking Cty. Bd. of Revision*, 133 Ohio St.3d 111, 2012-Ohio-3930, 976 N.E.2d 852, ¶ 20-22 (noting that under the income approach to valuing congregate care facilities, the income earned by a comparable facility was too closely tied to operating the business of eldercare to be indicative of the value of the real property); *accord Hilliard City Schools Bd.*

*of Edn. v. Franklin Cty. Bd. of Revision*, 128 Ohio St.3d 565, 2011-Ohio-2258, 949 N.E.2d 1, ¶ 33 (because most of the income earned by a hotel was from the rental of space, the court rejected an allocation to goodwill as an asset separable from the realty).

### 3. The BTA's determination of value was supported
### by reliable and probative evidence

**{¶ 46}** Ultimately, U-Store-It's arguments fail because the record in this case affirmatively establishes a basis for relying on the 2006 sale prices as the value of the realty. Namely, the underwriting performed by U-Store-It "plac[ed] a value on the properties based on net operating income": the staff developed a capitalization rate and took into account vacancy loss and cash flow from rents. In this manner, the staff determined what a reasonable investor would pay for the properties in order to obtain the income that the properties generate. That in-house valuation was the basis for the purchase prices allocated for each parcel set forth in the 2006 sale contract.

**{¶ 47}** We will accept a contractual allocation of sale price to individual properties when "other indicia on the face of the contract, the circumstances attending the allocation, or some other independent evidence establishes the propriety of the allocation." *St. Bernard Self-Storage, L.L.C. v. Hamilton Cty. Bd. of Revision*, 115 Ohio St.3d 365, 2007-Ohio-5249, 875 N.E.2d 85, ¶ 19. Weigand's testimony in the context of the present case furnishes specific "circumstances attending the allocation": the sale prices in the contract resulted from an income-approach valuation of the properties at issue conducted in-house by the purchaser. That testimony thereby furnishes direct support for the BTA's decision to adopt the sale prices as the value of the individual properties.

**{¶ 48}** As we have often acknowledged, " '[t]he fair market value of property for tax purposes is a question of fact, the determination of which is primarily within the province of the taxing authorities, and this court will not

disturb a decision of the Board of Tax Appeals unless it affirmatively appears from the record that such decision is unreasonable or unlawful.' " *EOP-BP Tower, L.L.C. v. Cuyahoga Cty. Bd. of Revision*, 106 Ohio St.3d 1, 2005-Ohio-3096, 829 N.E.2d 686, ¶ 17, quoting *Cuyahoga Cty. Bd. of Revision v. Fodor*, 15 Ohio St.2d 52, 239 N.E.2d 25 (1968), syllabus. In light of the foregoing discussion, it cannot be said that the record lacks support for the BTA's conclusion, much less that there is "a total absence of evidence to support" its findings. *See HealthSouth Corp. v. Testa*, 132 Ohio St.3d 55, 2012-Ohio-1871, 969 N.E.2d 232, ¶ 14. Accordingly, because " 'the record contains reliable and probative support' " for the BTA's decision, we will affirm it. *Satullo v. Wilkins*, 111 Ohio St.3d 399, 2006-Ohio-5856, 856 N.E.2d 954, ¶ 14, quoting *Am. Natl. Can Co. v. Tracy*, 72 Ohio St.3d 150, 152, 648 N.E.2d 483 (1995).

## Conclusion

{¶ 49} For the foregoing reasons, we conclude that the BTA acted reasonably and lawfully in adopting the 2006 sale prices as the value of the properties at issue. We therefore affirm the decisions of the BTA.

Decisions affirmed.

O'CONNOR, C.J., and PFEIFER, LANZINGER, KENNEDY, FRENCH, and O'NEILL, JJ., concur.

O'DONNELL, J., dissents and would reverse the decisions of the BTA.

_____

Rich & Gillis Law Group, L.L.C., Kelley A. Gorry, Mark H. Gillis, and Jeffrey H. Rich, for appellees Hilliard City Schools Board of Education and South-Western City Schools Board of Education.

Sleggs, Danzinger & Gill Co., L.P.A., Steven R. Gill, and Todd W. Sleggs, for appellant.

_____