[Cite as *Hilliard City Schools Bd. of Edn. v. Franklin Cty. Bd. of Revision,* 128 Ohio St.3d 565, 2011-Ohio-2258.]

HILLIARD CITY SCHOOLS BOARD OF EDUCATION, APPELLANT AND CROSS-APPELLEE, *v.* FRANKLIN COUNTY BOARD OF REVISION ET AL., APPELLEES; K.D.M. & ASSOCIATES, L.L.C., APPELLEE AND CROSS-APPELLANT.

[Cite as *Hilliard City Schools Bd. of Edn. v. Franklin Cty. Bd. of Revision,* **128 Ohio St.3d 565, 2011-Ohio-2258.**]

*Real property taxation — Hotel — Amount of purchase price the Board of Tax Appeals allocated to furniture, fixtures, and equipment was unreasonable because it was not supported by the record, but its decision not to allocate any of the purchase price to goodwill was reasonable.*

(No. 2010-0389 — Submitted April 19, 2011 — Decided May 17, 2011.)

APPEAL from the Board of Tax Appeals, Nos. 2007-M-277 and 2007-M-278.

_____

**Per Curiam.**

{¶ 1} This is an appeal and a cross-appeal from a decision of the Board of Tax Appeals ("BTA") in a real property valuation case. In its decision and order, the BTA found that the value of the hotel property at issue was $2,750,000 for tax year 2005, an increase from the value of $2,240,000 as determined by the Franklin County Board of Revision ("BOR").

{¶ 2} The BTA arrived at its decision by making specific adjustments to the BOR's determination. Both the BOR and the BTA predicated the valuation of the property as of January 1, 2005, on an arm's-length sale that occurred in February 2005. Because the sale involved the hotel as a going concern, both the BOR and the BTA viewed it as a bulk transaction in which real estate was one of several assets that were transferred for a total sale price of $3,600,000.

{¶ 3} The BOR started with the aggregate sale price of $3,600,000, then reduced that figure by $800,000 for furniture, fixtures, and equipment ("FF&E"),

by $60,000 for inventory items, and by $500,000 for the goodwill associated with the hotel franchise. These adjustments led the BOR to conclude that the arm's-length sale price for the real estate at issue was $2,240,000. Thus, $2,240,000 constituted the value of the realty as of January 1, 2005.

{¶ 4}   The Hilliard City Schools Board of Education appealed to the BTA. Based on the record that had been developed before the BOR, the BTA significantly increased the portion of the aggregate sale price assigned to the real estate. The BTA disallowed the $500,000 allocation to goodwill and the $60,000 allocated to inventory, but retained the $800,000 deduction attributable to FF&E. The BTA concluded that the value of the real estate was $2,750,000.[1]

{¶ 5}   In its appeal to the court, the school board asserts that the total sale price of $3,600,000 constitutes the value of the real estate, arguing that the BTA's allocation of $800,000 to personal property was not adequately supported by the record. On cross appeal, the owner seeks to restore the allocation of $500,000 to goodwill or business-enterprise value.

{¶ 6}   We hold that the BTA acted reasonably and lawfully when it rejected the deduction of goodwill from the sale price, and we affirm the decision as to the cross-appeal. With respect to the appeal, we hold that the $3,600,000 sale price should have been reduced by $280,000 for personal property rather than by $800,000. The BTA's deduction of $800,000 for the FF&E was both unreasonable and unlawful, because the 2005 year-end financial statement was not probative evidence for the allocation, and because the December 2004 appraisal prepared for the lender constituted the best available evidence. We therefore modify the allocation to personal property and otherwise affirm the decision of the BTA.

---

1. Straightforward arithmetic would lead to the conclusion that the true value of the real estate for tax year 2005 was $2,800,000 under the BTA's analysis, but the BTA stated the value as $2,750,000—apparently a clerical error. The BTA may have erroneously subtracted the amount allocated to personal property from the auditor's valuation rather than from the sale price.

**Facts**

**{¶ 7}**   The auditor assigned a value of $3,550,000 for tax year 2005 to the 80-room Hawthorn Suites hotel in this case.  The owner, K.D.M. and Associates, L.L.C. ("K.D.M."), filed a valuation complaint with the BOR on March 31, 2006, and the school board filed a countercomplaint on May 25, 2006.  K.D.M. originally sought a reduction to a true value of $2,400,000; the school board sought to retain the auditor's valuation.

**{¶ 8}**   K.D.M. predicated its decrease complaint on the arm's-length sale on February 1, 2005, one month after the tax-lien date.  On April 24, 2007, the BOR held a hearing.  At the hearing, the school board introduced the deed and conveyance-fee statement relating to the sale.  On the conveyance-fee statement, K.D.M. reported the full sale price of $3,600,000 as the price for the realty.

**{¶ 9}**   For its part, K.D.M. presented the testimony of A.J. Shah, the general manager and part owner of K.D.M.  Additionally K.D.M. presented the following documentary evidence:  (1) an inventory of certain personal property such as bed sheets, toilet paper, etc., (2) a list of FF&E of the hotel, (3)  a copy of the asset-purchase agreement dated November 2, 2004, (4) a copy of the settlement statement reflecting the sale price and the amount borrowed along with the sale expenses (there was no allocation to personal property on the settlement statement), (5) a bill of sale for personal property, including the "trade name of 'Hawthorn Suites,' " and all the "inventory, equipment, fixtures, assets used by seller in the business in the attached 'Exhibit A' " (there was no "Exhibit A" attached listing personal property, nor any value assigned to that property), (6) a security agreement for personal property executed in favor of the lender, (7) the Hawthorn Suites Standards Manual (the "Hawthorn Standards"), (8) a K.D.M. financial statement dated December 31, 2005, (9) a handwritten inventory of personal property prepared by Shah, (10) a real estate appraisal prepared for K.D.M.'s lender in December 2004, and (11) a loan-servicing agreement.

**{¶ 10}** Shah testified that he estimated the total value of FF&E at $10,000 per room for each of the 80 rooms of the hotel. Shah stated that the Hawthorn Standards dictated furnishings and equipment of $10,000 to $12,000 per room. The Hawthorn Standards presented to the BOR did not actually set forth cost figures; those were supplied solely by Shah's testimony.

**{¶ 11}** The BTA allocated $800,000 to FF&E based on the 2005 year-end financial statement. The financial statement consists of three pages: a two-page balance sheet and a one-page "tax asset detail." The statement lists an asset referred to as "furniture and equipment" at $936,405.67. After deducting $135,469.69 for depreciation, that asset was carried at $800,935.92 on the statement. The BTA used this statement to uphold the allocation of $800,000 of the sale price to FF&E and did not rely on Shah's oral testimony to support that allocation. In contrast to the financial statement, the appraisal prepared for K.D.M.'s lender estimated the value of the FF&E at $280,000.

**{¶ 12}** The asset-purchase agreement, captioned "Agreement of sale and purchase of real estate," recited that the "assets to be purchased" consisted of the fee-simple interest and improvements plus "[a]ll of Seller's furniture, fixtures, equipment, supplies, inventory, signage, and other personal property owned by Seller placed on, attached to, or used in the operation of the Hotel and located on the real property." Article II of the asset-purchase agreement addresses the purchase price, which explicitly ties the purchase price of $3,600,000 to the realty and the personalty.

**{¶ 13}** The asset-purchase agreement also makes reference to the "franchise agreement." Article V, section 1(d) of the asset-purchase agreement establishes that one of the buyer's contingencies is "acceptance of the franchise agreement with the franchiser (Hawthorn Suites), including acceptance of the franchiser's Product Improvement Plan (PIP or punch-list). The cost of the PIP, if any, shall not exceed One Hundred Thousand Dollars ($100,000). Seller shall

make his best effort to assist Buyer in transferring the franchise to Buyer on the same terms and conditions as presently enjoyed by Seller." In article VI, section 3(b), the seller covenants that it "is not a party to any license agreements or hotel reservations software license agreement * * * other than those listed and detailed on 'Exhibit C' of this Agreement."[2] That provision goes on to state, "Buyer will enter into a new franchise agreement with Hawthorn Suites to be effective upon the date that Buyer begins operation of the Hotel." (As previously noted, a separate bill of sale actually conveyed title to the personalty, both tangible and intangible, to K.D.M.)

{¶ 14} As discussed previously, the BOR used the asset purchase price, then made reductions based on the evidence before it. The BOR subtracted $800,000 for personal property based on the line items for equipment and depreciation on the 2005 year-end balance sheet. Next, the BOR subtracted $60,000 for inventory recorded by K.D.M.'s general manager. Finally, the BOR subtracted the amount attributable to goodwill on the balance sheet—$500,000— to arrive at a value of $2,240,000.

{¶ 15} The school board appealed to the BTA. The parties submitted the case on the existing record. The BTA rejected the deduction of $500,000 for goodwill, primarily because of the court's decision in *St. Bernard Self Storage, L.L.C. v. Hamilton Cty. Bd. of Revision*, 115 Ohio St.3d 365, 2007-Ohio-5249, 875 N.E.2d 85. The BTA also rejected the $60,000 allocation to inventory, and its determination in that regard has not been contested in the cross-appeal.

{¶ 16} On the other hand, the BTA adopted the $800,000 valuation of FF&E on the sole basis of the 2005 year-end financial statement. It did so in spite of the school board's explicit objection to using the financial statement, and the

2. Exhibit C is titled "Business Records" and lists four items. Three of the four items are profit and loss statements, income tax returns, and a revenue and occupancy report. The fourth item is listed as "Hawthorn Suites franchise agreement." But the franchise agreement itself is not in the record.

BTA made no findings to address the objection or otherwise support its sole reliance on a financial statement prepared with an as-of date a year after the lien date and 11 months after the sale of the property.

**Analysis**

{¶ 17} Pursuant to R.C. 5717.04, this court reviews a BTA decision to see if it is reasonable and lawful, and "if the record contains reliable and probative support" for the BTA's factual determinations, we will affirm the decision. *Am. Natl. Can Co. v. Tracy* (1995), 72 Ohio St.3d 150, 152, 648 N.E.2d 483. While the weighing of evidence lies within the discretion of the BTA as the finder of fact, see *Strongsville Bd. of Edn. v. Cuyahoga Cty. Bd. of Revision*, 112 Ohio St.3d 309, 2007-Ohio-6, 859 N.E.2d 540, ¶ 15, the question of "[w]hat the evidence in a case tends to prove" is a question of law. *Moore Personnel Servs., Inc. v. Zaino*, 98 Ohio St.3d 337, 2003-Ohio-1089, 784 N.E.2d 1178, ¶ 7. In determining an appeal based on evidence presented to the BOR, the BTA's duty is to "independently weigh and evaluate all evidence properly before it" in making its determination of value. *Columbus Bd. of Edn. v. Franklin Cty. Bd. of Revision* (1996), 76 Ohio St.3d 13, 15, 665 N.E.2d 1098.

{¶ 18} Under R.C. 5713.03, if real property "has been the subject of an arm's length sale between a willing seller and a willing buyer within a reasonable length of time, either before or after the tax lien date, the auditor shall consider the sale price * * * to be the true value for taxation purposes." In this case, the conveyance-fee statement reported the entire $3,600,000 purchase price as the price for the real estate. Under these circumstances, an owner who seeks an allocation of the sale price in order to reduce the valuation below the full sale price bears the burden of showing the propriety of allocating some portion of that reported price to other assets. *FirstCal Indus. 2 Acquisitions, L.L.C. v. Franklin Cty. Bd. of Revision*, 125 Ohio St.3d 485, 2010-Ohio-1921, 929 N.E.2d 426, ¶ 23,

25, 27-29; see also *St. Bernard Self-Storage, L.L.C. v. Hamilton Cty. Bd. of Revision*, 115 Ohio St.3d 365, 2007-Ohio-5249, 875 N.E.2d 85, ¶ 14, 19.

*Allocating $800,000 to FF&E was unreasonable and unlawful because the record does not support an allocation in excess of $280,000*

{¶ 19} The " 'fair market value of property for tax purposes is a question of fact, the determination of which is primarily within the province of the taxing authorities, and this court will not disturb a decision of the Board of Tax Appeals with respect to such valuation unless it affirmatively appears from the record that such decision is unreasonable or unlawful.' " *EOP-BP Tower, L.L.C. v. Cuyahoga Cty. Bd. of Revision*, 106 Ohio St.3d 1, 2005-Ohio-3096, 829 N.E.2d 686, ¶ 17, quoting *Cuyahoga Cty. Bd. of Revision v. Fodor* (1968), 15 Ohio St.2d 52, 44 O.O.2d 30, 239 N.E.2d 25, syllabus. But a determination of value by the assessor or the BTA will be reversed if the court determines that it is not based on reliable and probative evidence. See *Cincinnati School Dist. Bd. of Edn. v. Hamilton Cty. Bd. of Revision*, 127 Ohio St.3d 63, 2010-Ohio-4907, 936 N.E.2d 489, ¶ 23-30.

{¶ 20} After reviewing the evidence in the record that bears on whether and how to allocate a portion of the sale price to FF&E, the BTA stated its finding that "the most supportable value for the personalty is K.D.M.'s financial documentation for year-end 2005. * * * The documentation supports a value of $800,000, the amount deducted by the BOR." *Hilliard City Schools Bd. of Edn. v. Franklin Cty. Bd. of Revision* (Feb. 2, 2010), BTA Nos. 2007-M-277 and 2007-M-278, at 13. That is the full extent of the BTA's statement on the subject.

{¶ 21} We hold that the BTA's conclusion that $800,000 should be assigned to FF&E is not supported by reliable and probative evidence. Of crucial significance in our determination is the fact that elsewhere in its decision, the BTA explicitly found that it was "unable to conclude that the items other than realty should be valued in accordance with Mr. Shah's testimony." Id. at 12. At

the BOR hearing, Shah estimated an $800,000 allocation to FF&E based on multiplying the estimated cost of $10,000 per room times 80 rooms. The BOR apparently used Shah's testimony to corroborate its use of the year-end 2005 financial statement. But the BTA justifiably regarded the witness's computation as unsupported by documentary evidence and therefore unreliable; accordingly, the BTA could not rely on Shah's testimony to corroborate the 2005 year-end financial statement.

{¶ 22} As a result, the BTA's conclusion rested solely on the depreciated-personal-property figure derived from the 2005 year-end financial statement. The financial statement was an insufficient basis for the BTA's conclusion in three respects.

{¶ 23} First, the status of the financial statement as a business record depends upon Shah's testimony at the BOR hearing. Shah testified only that the document was a financial statement for year-end 2005 and was consistent with information on the company's federal tax return. On its face, the document states that it was "prepared without audit."

{¶ 24} In its brief at the BTA, the school board pointed out that there was "no evidence as to where these figures [on the financial statement] came from or how the document was prepared." The BTA failed to address this objection, and that was a substantial error because knowing the source of information on a financial statement is crucial in determining whether that information actually relates to what the parties had in mind when they negotiated the sale price. That is particularly true of a year-end financial statement that sets forth numbers that presumably would not have been within the contemplation of the parties to the asset purchase 11 months earlier.

{¶ 25} Second, the BTA failed to address the fact that the financial statement sets forth values as of December 31, 2005, a date that is 11 months after the asset purchase and a year after the lien date for tax year 2005. The statement

apparently derives from K.D.M.'s books and records and does not necessarily reflect an estimation of value that the parties would have considered when determining the $3,600,000 sale price.

{¶ 26} Third, allocating $800,000 to personal property conflicts with other evidence that more closely relates to the sale. The appraisal prepared for K.D.M.'s lender in December 2004 determined a value of $3,265,000 for the realty itself and separately stated a value of $280,000 ($3500 per room times 80 rooms) for personal property and $34,077 for business value. Given the other reasons for not relying on the year-end financial statement, we conclude that the existence of contrary evidence furnishes a powerful reason to reject it.

{¶ 27} Although counsel for K.D.M. has insisted that the appraisal was not probative because the appraiser did not testify, we conclude that the $280,000 figure in the appraisal report constitutes the best available evidence for the value of the FF&E. In doing so, we emphasize that the issue before us is what value the parties attached to the personal property in connection with the sale of the hotel as a going concern. For its part, the school board endorsed the appraisal value of $280,000 as being the "best evidence" of the value of the personal property. In this regard, the December 2004 appraisal presents an estimation of value apparently relied upon by K.D.M.'s lender that was within the contemplation of the parties at the time of the sale.

{¶ 28} That the parties did not formally commit to any allocation in the asset-purchase agreement does militate against making such an allocation after the fact. On the other hand, the record establishes that the 80 hotel rooms were furnished and that the furnishings were transferred along with the real property, and the BTA concluded that a deduction from the sale price for FF&E was justified. Because the personal property had some value, and because the December 2004 appraisal furnishes the best evidence of the value of the FF&E, we modify the allocation, reducing it from $800,000 to $280,000. See R.C.

5717.04 (conferring on the court the authority to modify unreasonable or unlawful decisions of the BTA).

*The BTA correctly found that K.D.M. had not proved entitlement to a reduction for goodwill reflected on the 2005 year-end financial statement*

{¶ 29} On cross-appeal, K.D.M. seeks to restore the $500,000 deduction from the sale price that the BOR allowed relating to the goodwill reflected in the 2005 year-end financial statement. For three reasons, the BTA acted properly in rejecting the deduction, and we therefore affirm its conclusion in this regard.

{¶ 30} First and foremost, K.D.M. argues that its entry for goodwill in the 2005 year-end financial statement corresponds to an intangible asset that it acquired as part of the asset purchase in February 2005. Specifically, K.D.M. identifies that intangible asset as the right to use the Hawthorn Suites name. But the asset-purchase agreement strongly indicates that no separate intangible right to use the Hawthorn Suites trade name was transferred in the asset purchase. To be sure, the bill of sale relating to the transfer of personal property recites conveyance of the "trade name of Hawthorn Suites," but the asset-purchase agreement clarifies that the buyer must obtain the intangible right separately, with the seller's help. As a result, the "conveyance" in the bill of sale appears to reflect the seller's quitting its claim to use the Hawthorn Suites trade name rather than actually constituting the transfer of a separate intangible right.

{¶ 31} Second, reliance on the 2005 year-end financial statement to establish the value of the intangible right to operate as a Hawthorn Suites hotel is mistaken because there is no reason to conclude that the financial statement's listing of goodwill of $500,000 constitutes a proper valuation of that intangible right. Quite simply, "goodwill" is an "intangible asset of a business" that is "recognized in the financial statements only when an entire business is acquired at a price in excess of the combined market values of its other assets." Larson & Miller, Fundamental Accounting Principles (13th Ed.1993) 587. Thus, when a

business is acquired, the accounting entry for goodwill reflects the "excess of acquisition cost over fair value acquired." Eskew & Jensen, Financial Accounting (2d Ed.1986) 614, fn. 4. Absent a separate entry on the financial statement that assigned a value to the intangible right to use the Hawthorn Suites trade name, the goodwill recorded on the 2005 year-end financial statement could conceivably include the value of such rights—but it would also include any other increment by which the acquisition cost exceeded the fair value of separately listed assets.

{¶ 32} Moreover, the goodwill entry on a financial statement derives from the value that has been assigned to other assets of the business. In this case, the 2005 year-end financial statement arrives at $500,000 for goodwill, in part by listing the land at a mere $350,000 and the building at $1,850,000. In other words, the low value assigned to the realty increases the value assigned to the goodwill. To place exclusive reliance on the financial statement to support a value reduction for tax purposes amounts to circular reasoning, and K.D.M.'s failure to supply any source for the figures on the financial statement results in their having no probative force for property-tax purposes. See *Am. Sheds, Inc. v. Cty. of Los Angeles* (1998), 66 Cal.App.4th 384, 394, 78 Cal.Rptr.2d 58 (assessment board's appraisal of real property was not vitiated by the fact that "plaintiffs' contractual allocation of the purchase price, and their title insurance coverage and appraisals, minimized the value of the [real] property as compared with the business assets," given that the "allocations largely reflected plaintiffs' own construction of the values, and at least one of them was specifically made for federal tax purposes").

{¶ 33} Third, apart from being equated with the intangible right to operate as a Hawthorn Suites hotel, the accounting entry for goodwill does not establish the existence of a separable asset that is distinct from the realty. The BTA found that the "bulk of the income earned by the hotel is from the rental of space," i.e., granting customers the possession of hotel rooms on a transient basis. *Hilliard*

*City Schools Bd. of Edn.*, BTA Nos. 2007-M-297 and 2007-M-278, at 7. In *St. Bernard Self-Storage*, 115 Ohio St.3d 365, 2007-Ohio-5249, 875 N.E.2d 85, we affirmed the BTA's rejection of an attempt to deduct "goodwill" as an increment of business value separate from the realty in the context of the sale of a storage facility. We noted that revenue derived from renting space relates to the "rights and privileges * * * appertaining to the land and improvements" pursuant to R.C. 5701.02 and that the value associated with obtaining the rent payments did not constitute a separable business asset from the realty itself. *St. Bernard Self Storage*, ¶ 24-25, citing *Dublin Senior Community L.P. v. Franklin Cty. Bd. of Revision* (1997), 80 Ohio St.3d 455, 460, 687 N.E.2d 426 (in valuing senior-care center, apartment rental was "real estate activity" that related to the value of the realty, not to a separate business value). The BTA correctly determined that the same principle applies to the "goodwill" in this case, so long as that asset referred to as goodwill on the financial statement has not been shown to be separately transferable.

### Conclusion

{¶ 34} For the reasons set forth, the BTA's allocation of $800,000 for personal property was unreasonable and unlawful. Pursuant to R.C. 5717.04, we therefore modify the BTA's decision in that regard, ordering that the allocation to personal property be reduced from $800,000 to $280,000. With respect to the cross-appeal, we affirm the BTA's rejection of the deduction of $500,000 for goodwill.

Judgment accordingly.

O'CONNOR, C.J., and PFEIFER, LUNDBERG STRATTON, O'DONNELL, LANZINGER, CUPP, and MCGEE BROWN, JJ., concur.

_____

Rich & Gillis Law Group, L.L.C., Mark H. Gillis, and Karol C. Fox, for appellant and cross-appellee.

Onda, LaBuhn & Rankin Co., L.P.A., Matthew A. LaBuhn, and Todd A. Ernsberger, for appellee and cross-appellant.

_____