[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *Harrah's Ohio Acquisition Co., L.L.C. v. Cuyahoga Cty. Bd. of Revision,* Slip Opinion No. 2018-Ohio-4370.]

NOTICE

This slip opinion is subject to formal revision before it is published in an advance sheet of the Ohio Official Reports. Readers are requested to promptly notify the Reporter of Decisions, Supreme Court of Ohio, 65 South Front Street, Columbus, Ohio 43215, of any typographical or other formal errors in the opinion, in order that corrections may be made before the opinion is published.

SLIP OPINION NO. 2018-OHIO-4370

HARRAH'S OHIO ACQUISITION COMPANY, L.L.C., APPELLEE, *v.* CUYAHOGA COUNTY BOARD OF REVISION ET AL., APPELLEES; WARRENSVILLE HEIGHTS CITY SCHOOL DISTRICT BOARD OF EDUCATION, APPELLANT.

**[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *Harrah's Ohio Acquisition Co., L.L.C. v. Cuyahoga Cty. Bd. of Revision,* Slip Opinion No. 2018-Ohio-4370.]**

*Taxation—Real-property valuation—Board of Tax Appeals ("BTA") did not commit legal error in assessing property owner's appraisal or in denying school board's motion for judicial notice but did commit legal error in refusing to consider school board's appraisal—BTA's decision vacated and cause remanded for BTA to fully consider and address evidence.*

(No. 2016-0568—Submitted July 31, 2018—Decided October 30, 2018.)

APPEAL from the Board of Tax Appeals, Nos. 2014-4596, 2014-4810, 2014-4818, and 2014-4896.

_____

**Per Curiam.**

{¶ 1} This is the third appeal before this court involving the real-property valuation of Thistledown, a "racino" in Cuyahoga County. In the first appeal, involving tax year 2010, we affirmed the decision of the Board of Tax Appeals ("BTA") valuing the real property at $13.8 million based on an appraisal submitted by the property owner. *Warrensville Hts. City School Dist. Bd. of Edn. v. Cuyahoga Cty. Bd. of Revision*, 145 Ohio St.3d 115, 2016-Ohio-78, 47 N.E.3d 144, ¶ 24-26 ("*Warrensville Hts. City School Dist. I*"). We rejected the school board's argument that a July 2010 bankruptcy sale of the horse racetrack and related assets for $43 million established the true value of the real property, because the sale occurred at auction and was a forced sale under R.C. 5713.04. *Id.* at ¶ 21-23. In the second appeal, involving tax year 2012, we again rejected the 2010 sale price as evidence of the real property's value and again affirmed the BTA's appraisal-based valuation (this time at $16.3 million). *Warrensville Hts. City School Dist. Bd. of Edn. v. Cuyahoga Cty. Bd. of Revision*, 152 Ohio St.3d 277, 2017-Ohio-8845, 95 N.E.3d 359 ("*Warrensville Hts. City School Dist. II*").

{¶ 2} This appeal involves tax year 2013. Unlike the two earlier cases, here, appellant, Warrensville Heights City School District Board of Education ("school board"), and appellee Harrah's Ohio Acquisition Company, L.L.C., Thistledown's owner, both submitted appraisal evidence. The BTA rejected the school board's appraisal and adopted that of Harrah's, valuing the property at $22 million. The school board appeals, asserting three propositions of law. Because the BTA committed legal error in assessing the school board's appraisal evidence, we vacate the BTA's decision and remand the cause to the BTA for further proceedings.

## I. FACTS AND PROCEDURAL HISTORY

{¶ 3} Thistledown is a 128-acre horse-racing facility that includes a one-mile track, numerous barns and support structures, and an eight-story grandstand. Harrah's estimates that between the July 2010 sale date and the January 1, 2013 tax-

lien date, it spent about $7 million improving the real property. A few months after the tax-lien date, Harrah's obtained a video-lottery-terminal ("VLT") license from the state of Ohio for $50 million. *See* Ohio Adm.Code 3770:2-11-01(B). "Thistledown Racino" began operating on the subject property in April 2013.

{¶ 4} The Cuyahoga County fiscal officer initially valued the subject property at $37,658,000. Harrah's asked the Cuyahoga County Board of Revision ("BOR") to decrease the valuation to $23,315,888—the sum of its expenditures for improvements to the real property and the property's tax-year-2012 valuation of $16.3 million. The school board asked the BOR to increase the total valuation to $43,000,000—the July 2010 sale price. The BOR retained the fiscal officer's original valuation, and both parties appealed to the BTA.

{¶ 5} At the BTA, the school board essentially abandoned its reliance on the July 2010 sale price in favor of the appraisal of Douglas F. Bovard, a certified appraiser. Bovard used the cost and income-capitalization approaches to value the subject property. He did not value the property under the sales-comparison approach.

{¶ 6} In Bovard's opinion, the best way to value the real property separately from the rest of the Thistledown enterprise is to assume that the property would be leased to a racino operator at market rent. He assumed that a typical lease in this market would call for percentage rent of a racino's "wagering handle." "Due to the scarcity of racetrack and casino leases," Bovard analyzed racetrack-property leases from 1986 to 1996 to estimate what those percentages would be. He concluded that market rent would be 1.5 percent of live on-track wagering handle, 0.5 percent of wagering handle from Thistledown races that are simulcast to other betting facilities, 0.5 percent of wagering handle for races simulcast to Thistledown, and 4 percent of net revenue from VLTs. Giving greater weight to this approach than to the cost approach, Bovard valued the property at $44.5 million as of January 1, 2013.

{¶ 7} For its part, Harrah's relied on an appraisal performed by certified appraiser David J. Sangree. Sangree used the income-capitalization, sales-

comparison, and cost approaches to value the subject property. Like Bovard, Sangree concluded that the income-capitalization approach was most applicable. But unlike Bovard, Sangree did not value the property as if it were leased to a racino operator at market rent. Instead, his income-capitalization method valued the entire Thistledown enterprise as a going concern; then, to determine the value of just the real property, he deducted the value attributable to nonreal property. Using this approach, Sangree concluded that as of January 1, 2013, Thistledown had a going-concern value of about $107 million. From that, he deducted $50 million (the value of the VLT license), $30.7 million (the value of personal property), and about $4.5 million (to account for the fact that the racino did not open until April 2013). After reconciling his conclusions under the different valuation approaches, Sangree valued the property at $22 million as of January 1, 2013.

{¶ 8} At the BTA hearing, when asked whether determining "the lease value"—i.e., using an approach similar to Bovard's—would have been better, Sangree testified that he did not believe that casinos are commonly leased and that he was not aware of any current leases in Ohio involving a racino property. Three months after the BTA hearing, in an effort to rebut Sangree's statements, the school board filed a motion asking the BTA to take judicial notice that some casinos operate on leased real estate or in the alternative, to reopen the hearing to allow the school board to introduce evidence supporting that assertion. The BTA denied the motion.

{¶ 9} The BTA found the income-capitalization approach to be most appropriate and adopted Sangree's valuation of $22 million. In reaching its conclusion, the BTA emphasized the differences between the appraisers' income-capitalization methodologies. Noting that Bovard had hypothesized the terms under which a landlord might lease the subject property, the BTA concluded that he had determined a "leased fee value." BTA Nos. 2014-4596, 2014-4810, 2014-4818, and 2014-4896, 2016 WL 2907629, *6 (Mar. 17, 2016). This, the BTA concluded, " 'taint[ed] the validity of the entire report.' " *Id*., quoting *JGT Ents., Inc. v. Logan*

*Cty. Bd. of Revision*, BTA No. 00-A-890, 2002 Ohio Tax LEXIS 393, *7-8 (Mar. 8, 2002). Accordingly, the BTA stated that it "[would] not consider Mr. Bovard's conclusions to value under his leased fee analysis." *Id.* In contrast, the BTA explained, Sangree had provided "a fee simple opinion of value" and valued the property "as it existed"—i.e., as owner-occupied. *Id.* at *7.

{¶ 10} The school board has appealed to this court.

## II.  ANALYSIS

### A.  Appraisal evidence

{¶ 11} As its first proposition of law, the school board argues that Sangree's appraisal contains several flaws and that Bovard's appraisal is legally sound and more reliable. We must affirm the BTA's decision if it is reasonable and lawful. R.C. 5717.04. Thus, if the BTA committed legal error in assessing the appraisals, we will not affirm its decision. *Lowe's Home Ctrs., Inc. v. Washington Cty. Bd. of Revision*, 145 Ohio St.3d 375, 2016-Ohio-372, 49 N.E.3d 1266, ¶ 15. We review legal issues de novo but defer to the BTA's findings concerning the weight of the evidence if there is support in the record. *Lunn v. Lorain Cty. Bd. of Revision*, 149 Ohio St.3d 137, 2016-Ohio-8075, 73 N.E.3d 486, ¶ 13.

### *1.  Sangree's appraisal*

{¶ 12} The school board argues both that Sangree's appraisal is contrary to Ohio law and that it is unsupported by the facts. Its legal arguments focus on the downward adjustments that Sangree made based on the value of racing and VLT licenses. Factually, the school board contends that Sangree relied on misleading, erroneous, and unsupported data.

#### *a.  Downward adjustments of comparable-sale prices*

{¶ 13} In his sales-comparison analysis, Sangree reduced the real-property values of his comparable sales by allocating 50 to 60 percent of the comparable-sale prices to the value of racing and potential VLT licenses associated with the properties. Focusing on the nontransferability of the licenses and relying on *Hilliard*

*City Schools Bd. of Edn. v. Franklin Cty. Bd. of Revision*, 128 Ohio St.3d 565, 2011-Ohio-2258, 949 N.E.2d 1, the school board argues that these adjustments are contrary to Ohio law.

{¶ 14} *Hilliard City Schools* involved the sale of a hotel as a going concern and the buyer's attempt to allocate $500,000 of the sale price to goodwill purportedly associated with the hotel franchise. The BTA had rejected the goodwill allocation, and in affirming the BTA's decision, we held that the buyer had not proved the propriety of the allocation, *id.* at ¶ 29-33. We noted that the franchise was not transferrable (and thus was not conveyed through the asset-purchase agreement), *id.* at ¶ 30, that the buyer's evidence did not prove that the allocation of $500,000 to goodwill was correct, *id.* at ¶ 31-32, and that given the nature of the business at issue—generating revenue from renting space—the buyer had not shown that any goodwill existed as an asset separate from the real property, *id.* at ¶ 33, citing *St. Bernard Self-Storage, L.L.C. v. Hamilton Cty. Bd. of Revision*, 115 Ohio St.3d 365, 2007-Ohio-5249, 875 N.E.2d 85, ¶ 24-25.

{¶ 15} The school board focuses on the first factor addressed in *Hilliard City Schools*—the nontransferability of the franchise—and analogizes the hotel buyer's attempt to allocate goodwill to Sangree's adjustment for the value of the licenses. But the school board misapprehends *Hilliard City Schools*. Significantly, the buyer in *Hilliard City Schools* allocated $500,000 to "goodwill" generally, not specifically to the franchise. *Id.* at ¶ 29-32. That allocation was improper because the buyer had not proved that goodwill existed as a separate intangible asset. The failure to prove the asset's existence necessarily foreclosed the conclusion that it had been transferred as part of the sale.

{¶ 16} Contrary to the school board's argument, *Hilliard City Schools* does not foreclose, as a matter of law, Sangree's view that racing and VLT licenses—or more precisely, *the opportunity to acquire* such licenses—are separate intangible assets. Sangree recognized that by purchasing the horse racetracks that were the

subjects of his comparable sales, the buyers had acquired not just real estate but also the opportunity to obtain racing licenses from the state of Ohio. *See* R.C. 3769.04. The racing licenses, in turn, created an opportunity to obtain VLT licenses. *See* Ohio Adm.Code 3770:2-2-01(R) and 3770:2-3-01(A)(11). In its brief, the school board itself acknowledges that "the possibility of obtaining a future VLT license from the State of Ohio was critically important to Harrah's." Sangree simply placed value on an intangible asset—the opportunity to acquire valuable licenses.

{¶ 17} In *Warrensville Hts. City School Dist. I*, regarding an earlier appraisal, we referred to Sangree's attribution of value to Harrah's "hope of operating VLTs at the racetrack." 145 Ohio St.3d 115, 2016-Ohio-78, 47 N.E.3d 144, at ¶ 12, 25. Although we did not fully endorse Sangree's view, we concluded that the BTA had reasonably and lawfully relied on his appraisal. *Id*. at ¶ 25-26. Sangree's approach is similar in this case: at the BTA hearing, he stated, "For each of these sales the buyers of these properties were not just buying the real estate. They were buying an operating racetrack and they were hoping to get the racino license." As in *Warrensville Hts. City School Dist. I*, the school board has not shown that it was contrary to law for Sangree to attribute separate value to a property owner's opportunity to acquire racing and VLT licenses.

*b. Deduction for value of VLT license*

{¶ 18} In his income-capitalization analysis, Sangree deducted $50 million from the market value of the going concern, representing the value of the VLT license. The school board argues that this adjustment also is contrary to Ohio law.

{¶ 19} The school board first contends that the VLT license is indistinct from the real estate and therefore cannot be valued separately. Here, the school board compares a VLT license to zoning laws that rather than create separate personal property, expand the permissible use of real estate. We reject this argument, because there are material differences between a government's exercise of the police power through zoning and its exercise of the police power through licensing.

{¶ 20} Zoning laws restrict land use. *See Euclid v. Ambler Realty Co.*, 272 U.S. 365, 386-387, 47 S.Ct. 114, 71 L.Ed. 303 (1926); *Black's Law Dictionary* 1856 (10th Ed.2014) (defining "zoning" as the "legislative division of a region, esp. a municipality, into separate districts with different regulations within the districts for land use, building size, and the like"). They do not target the conduct of individuals but apply generally to the real property in a class. *Union Oil Co. of California, Pure Oil Div. v. Brook Park*, 26 Ohio App.2d 153, 158, 269 N.E.2d 853 (8th Dist.1971) ("Zoning ordinances must be related to the general welfare of the public and cannot be used to control the business conduct of individual members of the public at large"). In contrast, licenses authorize persons to engage in otherwise unlawful conduct. *State v. Hipp*, 38 Ohio St. 199, 226 (1882); *Black's Law Dictionary* at 1059 (defining "license" as a "privilege granted by a state or city upon the payment of a fee, the recipient of the privilege then being authorized to do some act or series of acts that would otherwise be impermissible"). Thus, VLT licensing depends on the licensee's qualifications, not just the location of the activity. *See* Ohio Adm.Code 3770:2-3-01(A) (incorporating licensing requirements for lottery-sales agents under R.C. 3770.05 and Ohio Adm.Code Chapter 3770-2). That the state imposes territorial restrictions on the conduct of VLT licensees does not make the license itself a part of the real property on which the licensees operate.

{¶ 21} The school board similarly argues that the VLT license cannot be valued separately because the license cannot be transferred or retained apart from the real estate. Here, the school board relies on *St. Bernard Self-Storage*, 115 Ohio St.3d 365, 2007-Ohio-5249, 875 N.E.2d 85, a case in which we rejected a property owner's attempt to sever goodwill from the value of real estate.

{¶ 22} *St. Bernard Self-Storage* does not support the school board's argument. The nonreal-property asset at issue in *St. Bernard Self-Storage* was goodwill—i.e., "business value." *Id.* at ¶ 23-25. We concluded that the BTA had "correctly found no evidence in the record to support the existence of a business value

that could actually be severed from the real estate and be transferred or retained separately." *Id*. at ¶ 25. In reaching that conclusion, we focused on the nature of the property owner's business—a self-storage facility. *Id*. at ¶ 24. Because the property owner's business was to lease the real estate, its revenue necessarily represented the value of real property. *Id*. In other words, the nature of the business foreclosed the idea of goodwill as a separate asset.

{¶ 23} From our conclusion in *St. Bernard Self-Storage* the school board extrapolates that *no* asset can exist apart from real property unless it can be freely transferred apart from real estate. But the school board provides no support for such a broad rule. Indeed, the school board fails to realize that the nontransferability of the VLT license cuts both ways: if the license cannot be transferred with the real property, it must not be part of the real property.

{¶ 24} For purposes of Sangree's income-capitalization analysis, the pertinent question is whether the VLT license is nonreal property that has value as part of Thistledown's going concern. On that question, in the public-utilities context, this court has recognized that a nontransferable license can be a valuable asset to the current holder of the license. *See Harold D. Miller, Inc. v. Pub. Util. Comm.*, 10 Ohio St.2d 53, 225 N.E.2d 269 (1967) ("if such right or license cannot be transferred, it can have no value *except to its holder while he has it*" [emphasis added]). Thus, the school board has not shown that a VLT license cannot have distinct value merely because Harrah's cannot transfer it. It follows that Sangree's deduction for the value of the VLT license was not contrary to law.

*c. Soundness of Sangree's methods and underlying data*

{¶ 25} The school board also attacks the "reliability and credibility" of Sangree's report. In general, the school board alleges that Sangree failed to verify certain facts or support his valuation with reliable evidence. These arguments address "matters that are among those consigned to the expertise of the appraiser and to the board of revision and the BTA as fact-finders." *Dublin City Schools Bd. of*

*Edn. v. Franklin Cty. Bd. of Revision*, 147 Ohio St.3d 38, 2016-Ohio-3025, 59 N.E.3d 1270, ¶ 19. We reject the school board's invitation to interfere with the BTA's discretion in assessing these details of Sangree's appraisal.

### 2. *Bovard's appraisal*

{¶ 26} Although the subject property is owner-occupied, Bovard appraised it as if it were generating income under a hypothetical lease, under what he believes would be current market rates. Finding that owner-occupied property cannot be valued this way, the BTA declined to consider Bovard's appraisal. The BTA found that Bovard's methodology represented a leased-fee valuation that " 'taint[ed] the validity of the entire report.' " 2016 WL 2907629 at *6, quoting *JGT Ents., Inc.*, 2002 Ohio Tax LEXIS 393, at *7-8. Continuing, the BTA stated that "by performing a leased fee appraisal analysis of the owner occupied subject, Mr. Bovard has overstated the total value of the subject property; accordingly, we will not consider Mr. Bovard's conclusions to value under his leased fee analysis." *Id.*

{¶ 27} The BTA's refusal to consider Bovard's appraisal was legal error. We addressed the propriety of appraising owner-occupied property as if it were leased in *Meijer Stores Ltd. Partnership v. Franklin Cty. Bd. of Revision*, 122 Ohio St.3d 447, 2009-Ohio-3479, 912 N.E.2d 560, ¶ 21-23. After recognizing that a property owner may be able to realize the value of its property by encumbering it with a lease, we concluded that an appraiser may take that possibility into account when valuing it. *Id.* at ¶ 23; *see also Saratoga Harness Racing, Inc. v. Williams*, 697 N.E.2d 164, 166-167, 91 N.Y.2d 639 (1998) (approving the same approach in the valuation of a horse-racing facility). Appraising property in this way is consistent with R.C. 5713.03's directive to determine "the true value of the fee simple estate, as if unencumbered," so long as the appraisal assumes a lease that reflects the relevant real-estate market. *See* Appraisal Institute, *The Appraisal of Real Estate* 441 (14th Ed.2013) ("When the fee simple interest is valued, the presumption is that the property is available to be leased at market rates"); Ohio Adm.Code 5703-25-07(D)(2) (authorizing use of

income-capitalization approach in valuing real estate). Although the BTA ultimately may disagree with Bovard's factual assumptions about the lease terms, his methodology was not defective as a matter of law, and the BTA should have considered it.

{¶ 28} Aside from this legal issue, both parties devote significant parts of their briefs to the perceived strengths and weaknesses of Bovard's appraisal. For example, the school board contends that Bovard's report was reliable and well supported, while Harrah's argues that Bovard's approach is fraught with speculation. Harrah's also contends that Bovard is not a qualified expert. These are the types of questions that the BTA should have determined below. Because the BTA did not consider those questions or weigh Bovard's appraisal against the other evidence in any meaningful way, we vacate the BTA's decision and remand the case for the BTA to fully consider and address the evidence.

### B. Judicial notice

{¶ 29} As its second proposition of law, the school board argues that the BTA erred by not taking judicial notice that some casinos operate on leased real estate or in the alternative, by not reopening the hearing to allow for the introduction of evidence supporting that assertion. In support of its factual claim, the school board attached to its motion four documents: (1) a 2012 lease agreement between CBAC Gaming, L.L.C., and the city of Baltimore, Maryland, (2) the minutes of a governmental board meeting at which that lease was discussed, (3) a five-year financial plan for the city of Chester, Pennsylvania, that describes a "land lease" for a racetrack and casino, and (4) a news article that refers to the Chester lease agreement. The school board contends that its motion for judicial notice, which it filed three months after the BTA hearing, was necessary to rebut Sangree's statements at the hearing that he did not believe that casinos are commonly leased and that he was not aware of any current leases involving a racino property.

**{¶ 30}** Evid.R. 201(B) allows an adjudicative fact to be judicially noticed if the fact is "not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." The school board seems to invoke the second part of this rule, claiming that the documents it attached to its judicial-notice motion come from reliable sources— namely, governmental websites and the news publication's website.

**{¶ 31}** The school board's argument is unpersuasive. The general rule is that "new evidence may not be submitted after a hearing." *Emerson Network Power Energy Sys., N. Am., Inc. v. Lorain Cty. Bd. of Revision*, 149 Ohio St.3d 369, 2016-Ohio-8392, 75 N.E.3d 178, ¶ 20. Although judicial notice of a fact "may be taken at any stage of the proceeding," Evid.R. 201(F), it is not "an exception to the rule that evidence must be timely offered in a judicial proceeding," *AP Hotels*, 118 Ohio St.3d 343, 2008-Ohio-2565, 889 N.E.2d 115, at ¶ 8, fn. 1. The school board attempted to rely on Evid.R. 201 three months after the hearing closed. Because Evid.R. 201 does not override the general rule that requires parties to present their evidence before the hearing record closes, we hold that the BTA's decision denying the school board's motion for judicial notice was reasonable and lawful.

**{¶ 32}** Contrary to the school board's argument, this case does not present circumstances similar to those in *Emerson Network Power*, a case in which we recognized an exception to the general rule that a party may not submit new evidence after a hearing. In *Emerson Network Power*, the property owner had presented a draft purchase agreement for a sale of the property at issue. When the transaction closed several weeks after the hearing, the property owner filed a brief attaching copies of the deed and conveyance-fee statement. We held that under the "peculiarities of the case," the property owner could supplement the record with evidence of the completed sale. *Id*. at ¶ 2, 21. *Emerson Network Power* does not help the school board here, because its new evidence existed at the time of the hearing. The school

board has not shown that it was prevented from timely presenting the evidence. For this reason, the BTA correctly denied the school board's request for judicial notice and reasonably and lawfully denied its alternative request to reopen the evidentiary hearing.

### C. The sale as evidence of value

{¶ 33} As its third proposition of law, the school board argues that even if the July 2010 sale was a distressed sale under R.C. 5713.04, the $43 million sale price is relevant evidence of the property's minimum value. The school board made essentially the same argument as its second proposition of law in *Warrensville Hts. City School Dist. II*, 152 Ohio St.3d 277, 2017-Ohio-8845, 95 N.E.3d 359. As in the prior case, the school board has not shown that a non-arm's-length sale has evidentiary value. *See id.* at ¶ 11-12. We therefore reject the school board's third proposition of law.

### III. CONCLUSION

{¶ 34} For the reasons stated above, we vacate the BTA's decision and remand the case for the BTA to fully consider and address the evidence in the existing record.

Decision vacated

and cause remanded.

O'CONNOR, C.J., and FRENCH, FISCHER, DEWINE, and DEGENARO, JJ., concur.

O'DONNELL and KENNEDY, JJ., dissent.

_____

Kolick & Kondzer, Thomas A. Kondzer, and Joseph A. Volpe, for appellant.

Paul M. Jones Jr., for appellee Harrah's Ohio Acquisition Company, L.L.C.

_____